05-4196-pr
Acosta v. Artuz

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2007

(Argued:  April 7, 2008                              Decided: August 4, 2009)

Docket No. 05-4196-pr

VICTOR ACOSTA,

*Petitioner-Appellant,*

—v.—

C. ARTUZ, Superintendent, Green Haven Correctional Facility,

*Respondent-Appellee.*

_____

Before:

WALKER, CABRANES, and RAGGI, *Circuit Judges.*

Appeal from the denial of a petition for a writ of habeas corpus filed by a New York State prisoner who challenges his murder conviction on the ground that the trial jury was allowed to hear a confession that he made in violation of rights recognized in Miranda v. Arizona, 384 U.S. 436 (1966), and Rhode Island v. Innis, 446 U.S. 291 (1980).

AFFIRMED.

_____

MONICA R. JACOBSON, New York, New York, *for Petitioner-Appellant*.

MORGAN J. DENNEHY (Leonard Joblove, Victor Barall, *on the brief*), *on behalf of* Charles J. Hynes, District Attorney, Kings County, Brooklyn, New York, *for Respondent-Appellee*.

_____

REENA RAGGI, *Circuit Judge*:

Petitioner Victor Acosta was convicted after a jury trial on one count of murder in the second degree on a theory of felony murder. See N.Y. Penal Law § 125.25[3]. Presently incarcerated serving an indeterminate prison term of twenty-four years to life, Acosta appeals from the July 20, 2005 judgment of the United States District Court for the Eastern District of New York (David G. Trager, Judge), which denied his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. See Acosta v. Artuz, 375 F. Supp. 2d 173 (E.D.N.Y. 2005). Acosta claims, inter alia, that his conviction is infected by constitutional error because the jury was allowed to hear a confession made by Acosta in purported violation of Miranda v. Arizona, 384 U.S. 436 (1966), and Rhode Island v. Innis, 446 U.S. 291 (1980). We granted a certificate of appealability on two issues related to this claim: (1) whether Acosta adequately exhausted state remedies before seeking federal habeas relief by "fairly presenting" his Miranda/Innis claim to the state courts, and (2) whether Acosta demonstrated

Miranda/Innis error warranting habeas relief. We answer both questions in the negative and, accordingly, affirm the district court judgment.

## I. Background

### A. The Murder of Dennis Cetter

Yvonne Martinez, a Brooklyn prostitute, testified that sometime between 7:00 p.m. and 8:00 p.m. on November 1, 1991, Victor Acosta, whom she knew as "Green Eyes," told her that he "was going to catch a herb," street slang that Martinez understood to mean that Acosta was going to rob someone.[1] Soon thereafter, Acosta entered an abandoned factory building at North 10th Street and Kent Avenue and, armed with a knife, demanded money from Debra Perry, another prostitute who lived in the building, and Dennis Cetter, the man with whom Perry had spent part of the day.

Perry testified that she knew Acosta from the neighborhood, having seen him almost daily for the last month, and having used drugs with him. As Acosta searched through the couple's clothing looking for money, Perry reached for a baseball bat, but Cetter took it from

---

[1] This opinion generally does not cite to transcript pages because, with limited exceptions, the relevant hearing and trial transcripts were not included in the record on appeal. In response to this court's order directing submission of the transcripts, the parties advised that they could no longer be located. The court then issued an order indicating that we would assume the accuracy of the transcript excerpts cited in the parties' briefs and the district court's opinion unless either party objected within thirty days. See Acosta v. Artuz, No. 05-4196-pr (2d Cir. Sept. 22, 2008). No objection having been raised, we rely on the parties' briefs and the opinion below in reconstructing the record of the state court proceedings in this action.

3

her and used the bat to hit Acosta. A fight ensued during which Acosta stabbed Cetter thirteen times, inflicting wounds that would ultimately cause Cetter's death.

Darryl Higgs, a homeless drug user who lived with Perry at the factory and who was nearby at the time of the incident, testified to hearing Perry screaming and, moments later, seeing Acosta – whom he had known for several years as "Green Eyes" – flee the building. Soon after, Cetter also emerged from the building, covered in blood, and collapsed into Higgs's arms. Perry was hysterical and screaming about "Green Eyes."

Yvonne Martinez testified that approximately fifteen minutes after Acosta had first told her of his robbery plans, defendant returned to where they had spoken and breathlessly stated that he had "just finished stabbing a guy up" eight to ten times, likely killing him. Acosta gave Martinez a blood-stained knife and told her to clean it. Not wanting anything to do with the weapon, Martinez gave it to a friend, Patrick Wilson, who would give it to investigating police officers the following day, November 2.

On the morning of November 3, police arrested Acosta for Cetter's murder. At a station house lineup conducted the same day, Higgs, Perry, and Martinez each positively identified Acosta as the person they had implicated in the murder. Later that day, Acosta himself admitted to a police detective that he had stabbed Cetter but explained that his actions were taken in self-defense.

4

B.    State Court Proceedings

1.    The Suppression Hearing

Acosta was charged by a Kings County grand jury with two counts of Murder in the Second Degree, see N.Y. Penal Law § 125.25[1], [3]; one count of Robbery in the First Degree, see id. § 160.15[3]; and one count of Criminal Possession of a Weapon in the Fourth Degree, see id. § 265.01[2]. Prior to trial, Acosta moved, inter alia, to suppress his post-arrest admission alleging that it was the fruit of an unlawful arrest and had been obtained in violation of his right to counsel. Acosta did not present any evidence or submit an affidavit in support of his motion; nor did he testify at the hearing held to address the motion.

At that hearing, Police Detectives Nancy Gaffney and Ramon Aguilar testified to how they came to identify Acosta as Cetter's likely killer and to place Acosta under arrest. Detective Aguilar further stated that, after arrest, Acosta was advised of his Miranda rights when he was brought to the police precinct at approximately 5:30 p.m. Because Acosta invoked his right to counsel, police questioning was limited to securing pedigree information. See generally Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (recognizing "routine booking question exception which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services" (internal quotation marks omitted)). Detective Aguilar testified that between 6:00 p.m. and 7:00 p.m. the police placed Acosta in a lineup that was viewed separately by Perry, Higgs, and Martinez, each of

5

whom positively identified Acosta.

Approximately two hours later, when the identifying witnesses were leaving the station house, Detective Aguilar took Acosta to a second-floor bathroom to ensure against any contact between the defendant and the witnesses. At the hearing, Detective Aguilar testified that he did not recall telling Acosta that he had been identified in the lineup. At some point while Acosta was in the bathroom, he asked Detective Aguilar if he could speak with a prosecutor. After consulting with an assistant district attorney, Detective Aguilar told Acosta that the prosecutor could not speak to him in the absence of defense counsel. Without any prompting, Acosta then stated that he had entered the abandoned factory building on November 1 intending to commit robbery and that he had stabbed Cetter, but explained that he had acted in self-defense after Cetter had attacked him with a baseball bat. Acosta further told Aguilar that he had been smoking crack cocaine on November 1 and that he thought Cetter and Perry had been smoking crack as well.

Justice James G. Starkey found the prosecution witnesses credible and denied Acosta's motion to suppress his confession. The judge specifically found that the police had taken Acosta to the bathroom to avoid contact with the identifying witnesses and that Acosta's admission was made "without any interrogation or invitation to speak on the part of Detective Aguilar." Justice Starkey further found that Acosta had "meant [the statement] to be exculpatory," as evidenced by Acosta's explanation that his actions were taken solely

6

in self-defense.

      2.     <u>Trial and Conviction</u>

Acosta was tried in April 1993 before Justice Jerome M. Kay and a jury. Various civilian witnesses, including Higgs, Perry, and Martinez, testified to their knowledge of events relating to Cetter's murder. Government witnesses testified to the cause of Cetter's death, the recovery of the knife that killed him, the lineup identification, and other aspects of the investigation. Of particular relevance to this appeal, Detective Aguilar testified – for the first time – on cross-examination that at some unspecified time prior to the bathroom confession, he had informed Acosta that he had been identified in the lineup:

> Q:     When was the lineup completed?
>
> A:     Completed about 6:26.
>
> Q:     After the lineup was completed, did you then have a conversation with Mr. Acosta about what had taken place?
>
> A:     Yes, that is correct.
>
> [. . .]
>
> Q:     So, how long after the lineup was this statement [<u>i.e.,</u> Acosta's confession]?
>
> A:     What, about two hours after the lineup.
>
> Q:     So, during those two hours, you had no conversation whatsoever with him?
>
> A:     No. Other than some pedigree questions, like I

7

mentioned, concerning date of birth, height, and address, if any. He was hungry and wanted something to eat.

Q: Detective, didn't you tell Mr. Acosta that he had been picked out in that lineup?

A: Yes.

Q: That you now had witnesses that were identifying him as the perpetrator of this crime?

A: I indicated to the defendant that he was picked out in the lineup.

Q: At that point, did you not ask him again whether he now wished to explain his actions and what he did that night?

A: Oh yes, he did want to talk. He wanted to talk with the District Attorney.

Q: He did want to talk?

A: He did.

Q: So your testimony is that now he changed his mind after you told him that he had been picked out of the lineup and wanted to talk to the District Attorney?

A: Well, he changed his mind in the first case. He said he wanted a lawyer and wanted to [make] a phone call. After the lineup was conducted and he was moved from the cell room and into the bathroom, he indicated that he wanted to talk to the Brooklyn D.A.

Q: And how did he indicate that to you, just out of the clear blue sky said to you, "Detective, I want to now talk to the D.A.?"

A: Yes, I believe so. Yes.

8

Trial Tr. 265-67. Defense counsel did not argue to the trial court that Aguilar's testimony about the disclosure to Acosta of the lineup identification warranted reconsideration of the suppression motion. He did not move to strike Acosta's confession, about which the jury had already heard. He did not move for a mistrial.

The jury convicted Acosta of murder in the second degree on a theory of felony murder. See N.Y. Penal Law § 125.25[3]. On June 15, 1993, the court sentenced Acosta to an indeterminate prison term of twenty-four years to life.

### 3. Appellate Proceedings

With the assistance of new counsel on direct appeal, Acosta challenged his conviction on myriad grounds, arguing that (1) the jury should not have been allowed to hear his bathroom confession, (2) the lineup identifications were secured in violation of his right to counsel, (3) the lineup procedure was impermissibly suggestive, (4) exculpatory material was withheld from the defense, (5) the trial court impermissibly restricted his right of cross-examination, (6) the prosecutor's summation deprived him of a fair trial, (7) the court gave an improper "no inference" charge, (8) trial counsel was constitutionally ineffective, and (9) the trial evidence was legally insufficient to support conviction.

On February 20, 1996, the Appellate Division, Second Department, affirmed Acosta's conviction. The ruling states in full:

> Appeal by the defendant from a judgment of the Supreme Court, Kings County (Kay, J.), rendered June 15, 1993, convicting him of murder in the second degree, upon a jury verdict, and

9

imposing sentence. The appeal brings up for review the denial, after a hearing (Starkey, J.), of those branches of the defendant's omnibus motion which were to suppress a statement made by him to the police and identification testimony.

Ordered that the judgment is affirmed.

The hearing court properly denied suppression of the defendant's oral statement since that statement was voluntarily and spontaneously made (see, People v. Rivers, 56 N.Y.2d 476). Additionally, there is no merit to the defendant's contention that he was improperly denied counsel at the pre-accusatory lineup (see, People v. LaClere, 76 N.Y.2d 670; People v. Hernandez, 70 N.Y.2d 833; People v. Hawkins, 55 N.Y.2d 474, cert. denied 459 U.S. 846).

Viewing the evidence in the light most favorable to the prosecution (see, People v. Contes, 60 N.Y.2d 620), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, upon the exercise of our factual review power, we are satisfied that the verdict of guilt was not against the weight of the evidence (see, CPL 470.15 [5]).

The defendant's remaining contentions lack merit.

People v. Acosta, 224 A.D.2d 629, 629-30, 639 N.Y.S.2d 709, 709 (2d Dep't 1996). The

New York Court of Appeals denied leave to appeal. See People v. Acosta, 88 N.Y.2d 844,

644 N.Y.S.2d 690 (1996).

    C.    Federal Habeas Proceedings

    1.    The Initial Denial and Remand

Acosta proceeded to challenge his conviction in federal court by petitioning for a writ

of habeas corpus. See 28 U.S.C. § 2254. After preliminary litigation as to the timeliness of

10

Acosta's petition was resolved in his favor, see Acosta v. Artuz, 213 F.3d 625 (2d Cir. 2000) (unpublished summary order), the district court referred the matter to Magistrate Judge Roanne L. Mann, who, on September 7, 2001, issued a detailed report recommending dismissal. The district court adopted the recommendation on January 22, 2002, denying the petition in its entirety, as well as a certificate of appealability.

Acosta subsequently moved this court for a certificate of appealability, which was granted on September 25, 2002, for "the limited purpose of remanding the case to the district court to consider whether appellant's constitutional rights were violated when the trial court admitted his incriminating statement to Detective Aguil[ar], which had been made after appellant had invoked his Miranda right to the presence of counsel." Acosta v. Artuz, No. 02-2265-pr (2d Cir. Sept. 25, 2002). Noting the discrepancy between Detective Aguilar's testimony at the suppression hearing and his trial testimony regarding disclosure of the lineup identification to Acosta, this court observed that, "[b]ecause the district court did not consider whether, in light of Aguil[ar]'s testimony at trial, appellant's constitutional rights were violated by the admission of the statement, we remand so that the district court may make the determination." Id.

2. The Denial on Remand and the Instant Appeal

On remand, the district court issued a published opinion that carefully addressed the issues identified by this court and concluded that Acosta's challenge to the admissibility of his confession, to the extent it was based on Detective Aguilar's trial testimony, was (1)

11

procedurally barred because Acosta failed adequately to exhaust his claim in the state courts, and (2) without merit. See Acosta v. Artuz, 375 F. Supp. 2d 173.

Acosta again moved this court for a certificate of appealability, which was granted on two issues, "whether: (1) petitioner 'fairly presented' to the state courts his claim that an incriminating statement was admitted at trial in violation of petitioner's rights under Miranda v. Arizona, 384 U.S. 436 (1966), and Rhode Island v. Innis, 446 U.S. 291 (1980); and (2) whether petitioner's Miranda/Innis claim warrants habeas relief." Acosta v. Artuz, No. 05-4196-pr (2d Cir. Sept. 22, 2006). It is to these questions that we now turn.

## II. Discussion

### A. Standard of Review

We review the district court's denial of Acosta's petition for a writ of habeas corpus de novo. See, e.g., Clark v. Perez, 510 F.3d 382, 389 (2d Cir. 2008). Our de novo review is, however, informed by certain limiting principles. Notably, we cannot review challenges to state court convictions that have been clearly rejected by the state courts on independent and adequate state law grounds. See Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Richardson v. Greene, 497 F.3d 212, 217 (2d Cir. 2007). Nor will we consider claims that have not been exhausted by fair presentation to the state courts, see 28 U.S.C. § 2254(b)(1); Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citing cases), unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

12

miscarriage of justice," Coleman v. Thompson, 501 U.S. at 750.

Even where no such procedural obstacles apply, our de novo review is limited by standards of deference mandated by 28 U.S.C. § 2254(d). Under that statute, a federal court may vacate a state conviction only upon concluding that the challenged state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. "Where, as here, it is the state court's application of governing federal law that is challenged, the decision must be shown to be not only erroneous, but objectively unreasonable," Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009) (internal quotation marks omitted), a "substantially higher threshold," Schriro v. Landrigan, 550 U.S. 465, 473 (2007). We must assess the state court's decision "in light of the record the court had before it," Holland v. Jackson, 542 U.S. 649, 652 (2004) (citing cases), and it is the petitioner's burden to demonstrate that the state court applied the relevant clearly established law to that record in an objectively unreasonable manner, see Woodford v. Visciotti, 537 U.S. 19, 25 (2002); Sorto v. Herbert, 497 F.3d 163, 166-67 (2d Cir. 2007).

Applying these principles to this case, we conclude, as the district court did, that Acosta is not entitled to habeas relief.

13

B.  Procedural Concerns

1.  Independent State Ground

At the outset, we discuss two procedural issues addressed by the district court.  First, we note our agreement with the district court that the Appellate Division, Second Department, nowhere clearly and expressly indicated that it rejected Acosta's constitutional challenge to the admission of his confession on any independent state law ground.  See Acosta v. Artuz, 375 F. Supp. 2d at 178; People v. Acosta, 224 A.D.2d at 629-30, 639 N.Y.S.2d at 709.  Thus, the "concerns of comity and federalism" that bar federal review of claims denied on such grounds are not implicated here.  Coleman v. Thompson, 501 U.S. at 730.

2.  Exhaustion

Second, as the district court observed, a federal court must consider whether a habeas petitioner adequately exhausted state remedies by fairly presenting both the factual and legal premises for his federal claim to the appropriate state courts.  See 28 U.S.C. § 2254(b)(1); Baldwin v. Reese, 541 U.S. at 30-34; Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982) (en banc).  "[T]he question of whether a federal constitutional question was sufficiently asserted in state courts to form the basis of a federal habeas petition is ultimately a question of federal law which the federal courts must resolve for themselves."  DiSimone v. Phillips, 461 F.3d 181, 189 (2d Cir. 2006).

14

To the extent Acosta relies on Detective Aguilar's disclosure of the lineup identifications as a factual premise for his claim that his confession was coerced in violation of constitutional rights and, therefore, inadmissible, it is undisputed that Acosta did not present this argument to Justice Starkey at the time a hearing was conducted on his suppression motion. Nor did Acosta ask Justice Kay to reconsider the issue of suppression at trial when Detective Aguilar first testified to the identification disclosure.[2] Acosta nevertheless insists that he adequately exhausted state remedies because, on direct appeal, he "did not ask the appellate court to review the propriety of the hearing court decision, but rather argued that, upon the facts elicited at trial, appellant's statement should have been suppressed by the trial court." Appellant's Br. at 21-22 (emphasis in original). We are not persuaded.

a. Whether Unprotested Claims Are Adequately Exhausted by Presentation on Direct Appeal

Whether a state prisoner adequately exhausts unprotested claims by presenting them on direct appeal admits no easy answer. While some commentators have suggested that raising a claim on direct appeal can satisfy a federal habeas petitioner's exhaustion obligation, see 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE

---

[2] We note that, although Detective Aguilar did not testify until trial that he disclosed the lineup identifications to the defendant, Acosta himself presumably knew of the disclosure and was in a position to file an affidavit in support of his suppression motion asserting both the fact of the disclosure and its coercive effect on the statement he sought to suppress.

AND PROCEDURE § 23.3b, at 1068 & n.19 (5th ed. 2005), a question arises as to whether this conclusion is properly applied only to cases in which the appellate court actually addresses the unprotested claim. The Supreme Court has, after all, ruled that where a constitutional challenge to a state court conviction has been presented to the state courts "for the first and only time in a procedural context in which its merits will not be considered unless there are special and important reasons therefor[, r]aising the claim in such a fashion does not . . . constitute fair presentation." Castille v. Peoples, 489 U.S. 346, 351 (1989) (internal quotation marks and citation omitted); see also Bell v. Cone, 543 U.S. 447, 451 n.3 (2005) ("[A]s a general matter, the burden is on the petitioner to raise his federal claim in the state courts at a time when state procedural law permits its consideration on the merits, even if the state court could have identified and addressed the federal question without its having been raised.").

Acosta argues that Castille v. Peoples applies only to claims raised in applications for discretionary review. See 489 U.S. at 351 ("The Court of Appeals below held . . . that the submission of a new claim to a State's highest court on discretionary review constitutes a fair presentation. We disagree."); St. Helen v. Senkowski, 374 F.3d 181, 183 (2d Cir. 2004) ("[R]aising a federal claim for the first time in an application for discretionary review to a state's highest court is insufficient for exhaustion purposes." (citing Castille v. Peoples, 489 U.S. at 351)). He submits that his appeal to the Appellate Division was, by contrast, "as of right." Appellant's Br. at 24 (emphasis omitted). Even if we were to agree with Acosta that

16

Castille's holding applies only to discretionary appeals – a point we need not here decide – the exhaustion issue is more complex than Acosta might wish.

To be sure, a convicted New York defendant has a right of appeal to the Appellate Division of the New York Supreme Court. See N.Y. Crim. Proc. Law § 450.10. Moreover, the jurisdiction of New York's intermediate appellate courts is broad and extends even to errors not protested at trial. See id. § 470.15(1); see also People v. Cona, 49 N.Y.2d 26, 33, 424 N.Y.S.2d 146, 149 (1979). The law is clear, however, that a state prisoner has no "right" to Appellate Division review of unprotested errors; the Appellate Division may review such errors "[a]s a matter of discretion in the interest of justice." N.Y. Crim. Proc. Law § 470.15(3)(c), (6)(a). It is this language that appears to bring the Castille rule to bear and signals caution in concluding that unprotested claims not addressed by the Appellate Division are exhausted.

In this case, the Appellate Division gave no indication that it chose to exercise its discretion to review possible constitutional error in the trial judge's failure, unprotested by Acosta, to declare his confession inadmissible in light of Detective Aguilar's trial testimony. The Appellate Division's silence on this point is significant because, as the district court noted, "[i]t is well settled" in New York "that trial testimony may not be considered in evaluating a suppression ruling on appeal," and that where "the defendant fails to move to reopen a suppression hearing, he or she may not rely upon the trial testimony to challenge the suppression ruling." People v. Gold, 249 A.D.2d 414, 415, 670 N.Y.S.2d 789, 789 (2d Dep't

17

1998); see also People v. Gonzalez, 55 N.Y.2d 720, 722, 447 N.Y.S.2d 145, 146 (1981) (noting that "propriety of the denial [of suppression motion] must be judged on the evidence before the suppression court"); People v. South, 47 A.D.3d 734, 735, 849 N.Y.S.2d 603, 605 (2d Dep't 2008) ("Insofar as [defendant] relies upon [trial] testimony in arguing that his statements were not voluntarily made [and thus should have been suppressed], his contention is not properly before this Court."); People v. Douglas, 8 A.D.3d 980, 981, 778 N.Y.S.2d 622, 623 (4th Dep't 2004) ("To the extent that defendant relies upon trial testimony in challenging the court's determination, his claims are not properly before us."); People v. Williams, 305 A.D.2d 804, 807-08, 759 N.Y.S.2d 580, 584 (3d Dep't 2003) ("[W]e must discount defendant's reliance on the trial testimony of a witness to the pat-down as our review in this respect is limited to the suppression hearing testimony."); People v. Canteen, 295 A.D.2d 256, 256, 744 N.Y.S.2d 380, 381 (1st Dep't 2002) ("Since defendant never requested that the court reopen the suppression hearing, his claim that his trial testimony established the involuntariness of his statements is unpreserved, and we decline to review it in the interest of justice." (citation omitted)); but see People v. McCormick, 39 A.D.2d 590, 590, 331 N.Y.S.2d 840, 841 (2d Dep't 1972) (reversing denial of suppression motion and ordering new trial in interests of justice where officer's trial testimony was "in basic and flagrant contradiction" with that presented at suppression hearing). It was in these legal and factual circumstances that the district court concluded that "the evidence of Aguilar's trial testimony was presented [to the Appellate Division] in a context where it would not

18

ordinarily have been considered," and, thus, under Castille, any claim of error based on this evidence should not be deemed exhausted absent some record indication that the appellate court actually addressed the merits. Acosta v. Artuz, 375 F. Supp. 2d at 179-80.

While this reasoning is persuasive, we identify a more fundamental flaw in Acosta's exhaustion argument: the record does not demonstrate a fair presentation to the Appellate Division of the same challenge to the admissibility of his confession that he now pursues in his federal habeas petition.

          b.      <u>Acosta Failed To Alert the Appellate Division that His Challenge to the Admissibility of His Confession Charged Error by the Trial Judge</u>

We have carefully reviewed Acosta's brief to the Appellate Division, and we conclude that it did not fairly alert that court that the error being alleged was one by the trial judge, Justice Kay (before whom Acosta never challenged the admissibility of his confession), as distinct from any by the hearing judge, Justice Starkey (who denied Acosta's pre-trial suppression motion after an evidentiary hearing).

The first sentence of Acosta's brief to the Appellate Division states that he "<u>moved at trial</u> to suppress a statement that he made while under arrest." Petitioner's App. Div. Br. at 18 (emphasis added). This would not have alerted the Appellate Division to a claim of error by Justice Kay because the only suppression motion made by Acosta was the one filed prior to trial and ruled on by Justice Starkey. That Acosta was, in fact, referring to this pre-

19

trial motion in the opening sentence of his state appellate brief is convincingly demonstrated by the second sentence of the brief, which states: "A Huntley hearing was held and the motion denied."[3] Id.

Moreover, in arguing to the Appellate Division that coercive police conduct required suppression of his confession, Acosta referred the state appellate court to "the guidelines of a 'Huntley Hearing.'" Id. at 20 (indicating that prosecution was required to prove "that the defendant's statement was made voluntarily and not as the result of impermissible police interrogation"). Nowhere did Acosta indicate that he was faulting the trial judge for failing to apply these guidelines to a sua sponte reconsideration of Acosta's suppression motion in light of Detective Aguilar's trial testimony. Nor did he argue that, in light of the discrepancy between the trial and hearing records – which was certainly known to Acosta, but not to Justice Kay, who had not presided at the pre-trial hearing – the trial judge was legally obligated sua sponte to reconsider the admissibility of Acosta's confession. Indeed, he cited no legal authority indicating such an obligation of sua sponte review, which might have alerted the Appellate Division to the nature of his claim. See Daye v. Att'y Gen. of N.Y., 696 F.2d at 191-94.

Under these circumstances, we conclude that Acosta did not fairly alert the state

---

[3] A Huntley hearing is a pre-trial proceeding to determine the admissibility of a confession or admission. See People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838 (1965); see also United States ex rel. Walker v. Henderson, 492 F.2d 1311, 1314 n.13 (2d Cir. 1974).

appellate court that he was seeking reversal of his conviction based on an unprotested constitutional error by the state <u>trial</u> court, which was distinct from any error by the state <u>hearing</u> court in denying the motion to suppress. The Supreme Court has made clear that a claim is not "fairly presented" to a state appellate court if discovery of that claim requires the court to "read beyond a petition or a brief (or a similar document)" and conduct its own review of proceedings below. <u>Baldwin v. Reese</u>, 541 U.S. at 32; <u>see also</u> <u>id.</u> at 31 (holding that claim not fairly presented where "an appellate judge can discover that claim only by reading lower court opinions in the case"). Given the content of Acosta's state appellate brief, the Appellate Division could not have determined that Acosta was, as he now asserts, identifying error by the trial court unless it (1) carefully reviewed the hearing and trial transcripts; (2) recognized that the testimony Acosta identified on appeal as requiring suppression was offered only at trial and not at the pre-trial suppression hearing; and (3) inferred therefrom that Acosta must therefore be charging the trial court with error for failing <u>sua sponte</u> to revisit the suppression issue in light of Detective Aguilar's trial testimony. To require state appellate courts to engage in this level of investigation and conjecture to discover federal claims that may arise in a later habeas petition would be to "unjustifiably undercut the considerations of federal-state comity that the exhaustion requirement seeks to promote." <u>Id.</u> at 32.[4] We decline to impose such a requirement.

---

[4] Insofar as the <u>state's</u> brief to the Appellate Division argued that "defendant cannot impeach the hearing record with testimony subsequently adduced at trial," Respondent's

Because Acosta cannot now present his unexhausted claim of trial error to the state courts, we deem the claim procedurally barred.  See Washington v. James, 996 F.2d 1442, 1447 (2d Cir. 1993).  Acosta has not attempted to make the showing necessary to overcome such a bar, namely, "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that "failure to consider [his] claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. at 750.  Nor could he do so because, as we explain in the next section, Acosta's claim is lacking in merit in any event.  See Gittens v. Menifee, 428 F.3d 382, 387 (2d Cir. 2005) (noting that petitioner "cannot show prejudice or a fundamental miscarriage of justice, as his petition is plainly without merit").

C.    The Merits of Acosta's Challenge to the Admission of His Confession

Even if we were to assume that Acosta adequately exhausted state remedies on the precise challenge to the admission of his confession that he now raises in his habeas petition, we would agree with the district court that no relief is warranted because Acosta has not demonstrated that the state court's rejection of his claim on the merits was an objectively

---

App. Div. Br. at 32, the argument simply defends the hearing court's denial of Acosta's suppression motion.  Moreover, Acosta points us to no reply brief clarifying for the Appellate Division that he was arguing an error by the trial court separate and distinct from that of the hearing court.

unreasonable application of clearly established Supreme Court precedent.[5]

The Constitution famously states that no "person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. This protection from compulsory self-incrimination extends to the states through the Fourteenth Amendment. See Malloy v. Hogan, 378 U.S. 1, 6 (1964). In Miranda v. Arizona, the Supreme Court determined that the "in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." 384 U.S. at 467. As a prophylactic measure to address this concern, the Court formulated the "now-familiar procedural safeguards" – the Miranda warnings – deemed necessary "to secure the privilege against self incrimination." Colorado v. Spring, 479 U.S. 564, 572 (1987) (internal quotation marks omitted). Certain rules attend these procedures. Of particular relevance to Acosta's petition is the rule that when an arrested person "'expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

---

[5] Assuming that Acosta fairly presented his claim to the Appellate Division, we further assume that it was rejected on the merits when that court held that Acosta's "remaining contentions lack merit." People v. Acosta, 224 A.D.2d at 630, 639 N.Y.S.2d at 709. See Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) ("Nothing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process." (quoting 28 U.S.C. § 2254(d)(1))); see also Dye v. Hofbauer, 546 U.S. 1, 3 (2005) ("Failure of a state appellate court to mention a federal claim does not mean the claim was not presented to it.").

23

communication, exchanges, or conversations with the police.'" Arizona v. Mauro, 481 U.S. 520, 525-26 (1987) (second alteration in original) (quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)).

In Rhode Island v. Innis, the Supreme Court explained that "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." 446 U.S. at 301. The Court explained that "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." Id. Nevertheless, the Court declined to hold the police "accountable for the unforeseeable results of their words or actions." Id. at 302. Thus, police conduct would not qualify as interrogation simply because it "struck a responsive chord" in a defendant. Id. at 303. Rather, "[i]t must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." Id.

The parties agree that Acosta was under arrest and in police custody on the evening of November 3, 1991. They further agree that Acosta had been given Miranda warnings and had invoked his right to counsel before making the challenged confession. The point in dispute is whether it was objectively unreasonable for the state court to conclude that

24

Acosta's confession was a self-initiated communication and not the product of impermissible "interrogation" as that term is defined by Innis.

As noted above, our review of this issue must be undertaken "in light of the record the [state] court had before it." Holland v. Jackson, 542 U.S. at 652. We therefore note at the outset that, as Acosta's counsel conceded at oral argument, there is significant ambiguity in the state court record regarding the circumstances in which Detective Aguilar disclosed the lineup identifications to Acosta. Most important, Acosta's trial counsel failed to establish when, in the approximately two-hour interval between the lineup identifications and Acosta's confession in the bathroom, Detective Aguilar revealed the results of the lineup to Acosta. The testimony elicited from Detective Aguilar on cross-examination is equally consistent with a finding that the disclosure took place two hours before Acosta's confession, two minutes before, or, indeed, at any time in-between. See supra at **[7-8]** (quoting full exchange).[6] Moreover, it is not apparent from the record whether Acosta's statement was made in response to Detective Aguilar's disclosure of the lineup identifications, as Acosta

_____

[6] The district court concluded that various inconsistencies in Detective Aguilar's testimony regarding the disclosure of the lineup identifications were attributable to flawed memory, not intentional falsehood. Acosta v. Artuz, 375 F. Supp. 2d at 181-82. To the extent Acosta faults the district court's fact finding on this point, we observe only that, for reasons discussed more fully in the text of this opinion, no federal fact finding is necessary to conclude that the state courts were not compelled by clearly established Supreme Court precedent to hold that the Detective Aguilar "should have known" that his actions "were reasonably likely to elicit an incriminating response" from Acosta. Rhode Island v. Innis, 446 U.S. at 303.

25

never made such an assertion before the hearing or trial court; nor did he submit an affidavit or testify on this point.

Thus, the record developed by Acosta before the state court indicates only that, at some point during a two-hour period before Acosta confessed, he was told that he had been identified in a lineup. This record does not permit us to conclude that rejection of Acosta's Miranda/Innis claim was objectively unreasonable.

First, Innis instructs that evidence that police conduct "struck a responsive chord" in a detained person is not enough, by itself, to equate the conduct to "interrogation." 446 U.S. at 303. We doubt, however, whether a petitioner can state – much less demonstrate – a constitutional violation under Miranda and Innis without asserting such a responsive effect in his own case. See id. (holding that suspect's statement "must [be] . . . the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response" (emphasis added)). Acosta failed to make such an assertion before the state court and, in any event, the record indicates that significant events occurred between the time Acosta learned about the results of the lineup and when his statement was made that undermine any claim of a causal link between Detective Aguilar's disclosure and Acosta's statement. Before Acosta made the statement, he asked to speak with a prosecutor. See supra at [6]. After consulting with an assistant district attorney, Detective Aguilar reported to Acosta that, because he had invoked his right to counsel, the

26

assistant district attorney would not speak to Acosta without defense counsel present. Id. Acosta does not argue – nor does the record indicate – that Detective Aguilar thereafter said or did anything to urge Acosta to waive his right to counsel. Rather, with the right to counsel thus reiterated and with the authorities' commitment to honoring that right confirmed, Acosta volunteered to Detective Aguilar that he had stabbed Dennis Cetter but that he had acted only in self-defense. On this record, it would not have been objectively unreasonable for the state court to conclude that Acosta's statement was not "the product of" Detective Aguilar's disclosure regarding the lineup. Rhode Island v. Innis, 446 U.S. at 303.

Second, even without these intervening events, we are not persuaded that the state courts were compelled to equate Detective Aguilar's disclosure of the results of the lineup to interrogation under Innis. While the Supreme Court in Miranda suggested that the disclosure of lineup identifications could be used by police "to induce a confession out of trickery," Miranda v. Arizona, 384 U.S. at 453, this does not compel a conclusion that every disclosure of an identification or of other inculpatory evidence constitutes interrogation under clearly established Supreme Court precedent. Rather, Innis calls upon courts to consider police conduct in light of the totality of the circumstances in assessing whether the police "should have known" that their actions "were reasonably likely to elicit an incriminating response." 446 U.S. at 303.

Applying this standard, courts have not endorsed the proposition that "statements by

27

law enforcement officials to a suspect regarding the nature of the evidence against the suspect constitute interrogation as a matter of law," recognizing that "[i]t simply cannot be said that all such statements are objectively likely to result in incriminating responses by those in custody." United States v. Payne, 954 F.2d 199, 203 (4th Cir. 1992) (emphasis added); see also Caputo v. Nelson, 455 F.3d 45, 50 (1st Cir. 2006) ("'[T]he Innis definition of interrogation is not so broad as to capture within Miranda's reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges.'" (quoting United States v. Payne, 954 F.2d at 202)). Indeed, courts have generally rejected claims, such as Acosta's, that disclosure of the results of a lineup or other inculpatory evidence possessed by the police, without more, constitutes "interrogation" under Innis. See United States v. Allen, 247 F.3d 741, 765 (8th Cir. 2001) (holding that "informing [defendant] of the results of the lineup did not amount to the functional equivalent of interrogation for purposes of the Fifth Amendment" where "the officer simply described the results of the lineup, unaccompanied by any threats or other compelling pressure");[7] see also Caputo v. Nelson, 455 F.3d at 51 (holding that no interrogation occurred where defendant merely overheard officer discussing certain evidence

[7] The Supreme Court vacated the Eighth Circuit's judgment in Allen and remanded for further consideration in light of Ring v. Arizona, 536 U.S. 584 (2002) (holding that Arizona statute allowing trial judge to determine presence or absence of aggravating factors in capital case violated Sixth Amendment). See Allen v. United States, 536 U.S. 953 (2002). The decision on remand is reported at 406 F.3d 940 (8th Cir. 2005) (en banc). This subsequent history does not call into question the Eighth Circuit's holding in the passage quoted above.

28

on the phone); Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006) (holding that state court did not act unreasonably in rejecting claim that officer's "matter-of-fact communication of the evidence against [defendant] and the potential punishment he faced" did not constitute interrogation); Enoch v. Gramley, 70 F.3d 1490, 1500 (7th Cir. 1995) (holding that incriminating statements were not result of interrogation where "the police identif[ied] the victim to the suspect and briefly stat[ed] the evidence against him"); Shedelbower v. Estelle, 885 F.2d 570, 572-73 (9th Cir. 1989) (informing defendant that he had been identified by rape victim was "not the functional equivalent of questioning"); cf. United States v. Szymaniak, 934 F.2d 434, 436-37, 439 (2d Cir. 1991) (holding that interrogation occurred where officer visited defendant "three or four times" to confront him with inculpatory information and "request[ed] that he give [the police] a statement"); see generally DAVID M. NISSMAN & ED HAGEN, LAW OF CONFESSIONS § 5:8 (2d ed. 2009) ("A few courts have found that talking about the evidence can be interrogation, even where the officer asks no questions. However, the majority of cases have gone the other way.").

In sum, given the vague, incomplete record developed by Acosta before the state courts and the case law cited above, we cannot conclude that it was objectively unreasonable under clearly established Supreme Court precedent to hold that Detective Aguilar's disclosure of the results of the lineup did not constitute "interrogation" under Innis. See Jackson v. Frank, 348 F.3d 658, 665 (7th Cir. 2003) (observing that "the determination by

29

one of our sister circuits that" a particular claim is without merit "certainly makes it more difficult to conclude that" the state court "unreasonably applied Supreme Court authority" in rejecting a similar claim). We need not consider whether further record development might have revealed additional facts supporting Acosta's claim, because Acosta "bears the burden of demonstrating an unreasonable application of federal law," and he must also bear the consequences of his failure to develop a more complete record on that point. Sorto v. Herbert, 497 F.3d at 167; see id. at 167 ("Because [petitioner] bears the burden of demonstrating an unreasonable application of federal law, the insufficiency of the record defeats his petition."); cf. 28 U.S.C. § 2254(e)(2) (providing, with exceptions not relevant here, that habeas petitioner is not entitled to evidentiary hearing where he "has failed to develop the factual basis of a claim in State court proceedings"). Thus, we reach the same conclusion on de novo review as the district court: Acosta fails to demonstrate that the state court's admission of his volunteered confession violated clearly established Supreme Court precedent.

## III. Conclusion

To summarize, we conclude:

(1) The review authority of New York's Appellate Division to hear claims of unprotested error is discretionary. A question thus arises under Castille v. Peoples, 489 U.S. 346, as to whether Acosta's direct appeal challenge to the trial court's failure sua sponte to

30

reconsider the admissibility of his confession was adequately exhausted in the absence of indication that the state appeals court actually addressed the merits of the claim.

(2) The applicability of <u>Castille</u> to this case need not be decided because the record reveals a more fundamental exhaustion defect: Acosta failed clearly to identify for the state appellate court that he was charging the <u>trial judge</u> with an error in failing <u>sua sponte</u> to reconsider the admissibility of his confession, which error was separate and distinct from any decision made by the <u>hearing judge</u> in denying Acosta's suppression motion.

(3) Because no state remedies remain available to Acosta, his unexhausted claim is deemed procedurally barred. Acosta fails to demonstrate the cause and prejudice or miscarriage of justice necessary to secure a merits review of such a barred claim. Indeed, he cannot do so because his claim lacks merit. On the record presented to the state court, Acosta cannot demonstrate that clearly established Supreme Court precedent compelled the state court to conclude that his confession, made after invocation of the right to counsel, was inadmissible as the product of interrogation rather than admissible as a volunteered statement.

The judgment of the district court denying a writ of habeas corpus is AFFIRMED.

31